UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
DOUGLAS GORDON and                      )
WILLIAM REUMANN,                        )
                                        )
        Plaintiffs,                     )
                                        )          Civil Action No.
        v.                              )          14-14145-FDS
                                        )
EARTHLINK, INC.,                        )
                                        )
        Defendant.                      )
_____ )
```

MEMORANDUM AND ORDER ON DEFENDANT'S
<u>MOTION TO STRIKE AND MOTION FOR SUMMARY JUDGMENT</u>

SAYLOR, J.

This is an employment dispute arising out of alleged terminations on the basis of age.

Jurisdiction is based on diversity of citizenship.

Plaintiffs Douglas Gordon and William Reumann were salespersons at EarthLink, Inc.

Following a whistleblower complaint and internal investigation, they were terminated.  Earthlink

contends that they were terminated for misconduct; plaintiffs contend that they were in fact

terminated on the basis of their age, and that EarthLink engaged in a reduction in force that

disparately impacted employees over the age of 40.

Plaintiffs have brought claims for discrimination based on both disparate treatment and

disparate impact pursuant to Mass. Gen. Laws ch. 151B.  EarthLink has moved for summary

judgment as to all claims of both plaintiffs.  For the reasons stated below, those motions will be

granted.

I.      **Background**

A.      **Factual Background**

The following facts are either undisputed or set forth in the light most favorable to plaintiffs, the non-moving parties.

EarthLink, Inc. is a telecommunications company based in Atlanta, Georgia, that provides technology, network, and communications services.  (Def. SMF. ¶ 1).  On April 1, 2011, EarthLink acquired One Communications Corp ("OneComm").  (*Id.* at ¶ 2).

At the time of the acquisition, Douglas Gordon and William Reumann were both salespersons in the Burlington, Massachusetts office of OneComm.  (Sincavage Dep. at 43). Gordon was a Premier Account Executive who reported directly to Reumann, a Regional Sales Manager.  (Gordon Aff. ¶ 5, 8).[1]  Reumann reported to Terri (Radford) Sincavage, a Vice President in the Burlington office.  (*Id.*).

1.      **Sales Process**

As members of the sales team, both Gordon and Reumann were compensated with a base salary plus commissions.  (*Id.* at ¶¶ 8, 10).  As a sales representative, Gordon's commissions were determined based on the revenue generated by the sales he completed.  (Sen. Decl. ¶¶ 6- 10).  Reumann's commissions depended on the commissions of the team he managed.  (Gordon Aff. ¶ 8; Reumann Dep. at 42).

EarthLink customers paid monthly recurring charges ("MRCs") for services.  (*Id.* at ¶ 7). Commissions were calculated, in part, based on the net incremental revenue growth of MRCs.

---

[1] The parties dispute whether Reumann was promoted to a director-level position before he was terminated. (Def. Resp. to Pls. SF at 2).  Reumann contends that EarthLink promoted him to a director-level position at the end of July 2011.  (Reumann Aff. ¶¶ 9).  EarthLink does not dispute that Reumann received a salary increase in the summer of 2011, but contends that his title did not change.  (Koris Dep. at 42).  The dispute is not material to the motions for summary judgment.

(*Id.* at ¶ 8).  When a customer purchased a new service that did not replace any pre-existing services, the entire gross MRC constituted net incremental revenue growth.  (*Id.* at ¶ 9).  When a member of the sales team sold a service conversion that expanded a customer's pre-existing services, the resulting net incremental revenue growth was the difference between the existing MRC and the MRC of the newly purchased service.  (*Id.* at ¶ 10).

Sales representatives at EarthLink documented their sales by signed order forms.  If a salesperson misrepresented previously existing MRCs on an order form, or reported a conversion as a new sale, it could lead to a higher stated revenue growth on the customer's account, and inflate his or her commissions.  (Porter Dep. at 55-56; Reumann Dep. at 122).  EarthLink has safeguards in place to identify improper sales reporting.  It asserts, however, that because of the high volume of sales, employee honesty is crucial to maintaining the integrity of the commission payment system.  (Sen Decl. ¶¶ 11-12).

### 2.        Policies Regarding the Use of Company Resources

When plaintiffs were employees of OneComm, the company maintained written policies concerning the use of company resources.  For example, the OneComm handbook stated, "[y]ou may not establish or maintain an outside business that could cause any potential or actual conflict with your employment with the Company or the Company's interests. . . . Employees may not use OneCommunications' resources, equipment, property or time to work on or support a non-business activity."  (Gordon Dep. Ex. 3).  Another section of the handbook stated, "[d]uring work hours, you may not engage in any activity on behalf of another employer, entity, or your own business."  (*Id.*).

EarthLink also maintains a written Code of Business Conduct and Ethics that states, among other things, "[p]ersonal use of the technology system must not disrupt the operation of

EarthLink's networks or of other users, and such use may not interfere with the productivity of any employees." (Gordon Dep. Ex. 7).

### 3.     __Whistleblower Complaint and Investigation__

In July 2011, a former EarthLink employee contacted EarthLink's Chief People Officer and lodged a whistleblower complaint. (Sen Decl. Ex. A). The complaint alleged that Gordon openly took personal calls and completed work for other businesses while working at EarthLink's Burlington office. (*Id.*). The complaint also alleged that Gordon and Reumann improperly reported sales to inflate commission payments and made generalized complaints concerning Sincavage's leadership. (*Id.*).

In response, EarthLink assembled its investigations committee to evaluate the merits of the complaint. (Sen Decl. ¶ 15). The committee included Alva "Trey" Huffman, Vice President and Treasurer; Tammy Harley, Director of Internal Audit; Peter Chronis, Director of Information Security & Risk Management; Michelle Candelaria, Senior Human Resources Manager; Ayseli Sen, Senior Manager of Internal Audit; and members of EarthLink's legal team. (*Id.*).[2] None of the members of the committee were located at the company's Burlington office. (Sen Dep. at 9).

Sen analyzed a sample of Gordon's sale orders as part of the investigation. (Sen Dep. at 22). She contends that on multiple occasions, Gordon improperly categorized sales as new or underreported the MRCs of pre-existing services, which led to his receiving inflated commissions. (Sen Dep. Ex. 12). She also contends that all of Gordon's "irregular" orders were signed by Reumann instead of Gordon himself. (Sen Dep. at 73).

In addition, the committee found e-mails on Gordon's EarthLink account concerning outside businesses that he operated. (Sen Dep. Ex. 11). Sen and Candelaria called Gordon's

---

[2] Michelle Candelaria is no longer employed by EarthLink.

EarthLink-provided office number, and discovered that it had been re-routed to a personal line, with the voicemail answering as "Boston Events Specialists."  (Sen Dep. Ex. 11).

### 4.    Terminations

Sen and Candelaria scheduled an interview with Gordon, informing him beforehand that it was to discuss the business environment at EarthLink generally.  (Gordon Aff. ¶ 15).  They did not notify him in advance that he was under investigation.  (*Id*.).  At the meeting, Gordon was asked to explain the alleged irregularities in his sales reporting and the accusations of improper moonlighting.  (*Id.* at ¶ 16).  He apparently did not provide satisfactory answers.  In explaining one of the alleged sales irregularities, Gordon told Sen that the problem "could have been an oversight . . . ."  (Gordon Dep. at 244).[3]

Gordon now contends that to answer all of Sen and Candelaria's questions properly, he would have needed additional time to obtain information and confer with personnel in the billing department.  (*Id*.).  He also contends that Sen was confused about the commissions process as a whole.  (*Id*.).

As to the moonlighting allegations, Gordon admitted to managing outside businesses while he was an EarthLink employee.  (*Id*. at 273).[4]  He also admitted to re-routing his EarthLink office telephone number to a private line, which he claimed he did with the help of EarthLink's IT department.  He claimed, however, it was only on a temporary basis while a second cell phone that he used specifically for EarthLink business was broken.  (*Id*. at 235-236; Gordon Aff. 14).  The report from the interview states, "Doug acknowledged that he did receive some emails

---

[3] While Gordon made this concession in his initial meeting with Sen and Candelaria, he testified at his deposition that he later realized Sen's analysis was inaccurate and the problem was "more of a systems issue than a sales issue."  (Gordon Dep. at 244-45).

[4] Gordon contends that his coworkers on the sales team were aware of his businesses and that it had never been an issue with EarthLink in the past.

relating to his other businesses but that it didn't affect his work at EarthLink." (Sen Dep. Ex. 11). At his deposition, Gordon stated that while he "[could not] cite a specific instance . . . if something came up, then, yes, [he] would answer the email or phone call." (Gordon Dep. at 285).

At the conclusion of the meeting, Gordon was terminated. He contends he was told that the termination was for violating the company's moonlighting policy. (Gordon Aff. ¶ 16). He asserts that Candelaria provided him with a convoluted explanation as to the specifics of his termination, with the only concrete justification being his re-routed telephone line. (*Id*.).[5] For several months, Gordon continued to receive commission payments, and EarthLink never asked him to return any of his commissions, even those corresponding to the accounts cited in the investigation. (*Id*. at ¶ 17).

Shortly after Gordon was terminated, a meeting was held with Reumann to discuss the alleged irregularities in Gordon's orders. (Reumann Aff. ¶ 11). Sen and Candelaria participated in the meeting by telephone, while Sincavage and a human resources manager were present with Reumann in the Burlington office. (*Id.*). As with Gordon, Reumann was not informed in advance that he was being investigated for misconduct. (*Id.*). Reumann contends that the presentation during the meeting was not logical or coherent. (*Id.*). He further contends that Sen and Candelaria "lacked [a] fundamental understanding of the data and information they were trying to present." (*Id.*). He admitted at the meeting, however, that he signed the paperwork on behalf of Gordon and agreed that by doing so he was attesting to its accuracy. (Reumann Dep. at

---

[5] Gordon contends that when Candelaria explained the grounds for his termination, she never mentioned the alleged sales irregularities as grounds for her ultimate decision. (Gordon Aff. ¶ 16).

124).  Reumann contends that he was terminated at the conclusion of the meeting for "signing too many of Doug's contracts."  (*Id.*).

Earthlink had no specific policy in place prohibiting sales managers from signing an order on behalf of one their salespeople.  (*Id.*).[6]  EarthLink did not require Reumann to return any commissions received during his employment.  (*Id.* at ¶ 16).

Gordon was 42 years old when he was terminated.  Reumann was 52.  (Gordon Dep. at 118; Reumann Dep. at 44).  Neither employee reported any prior acts of discrimination while they were with the company.  (Gordon Dep. at 354-355; Reumann Dep. at 289).  Terri Sincavage, who was also mentioned in the whistleblower complaint, and who was in her 30s at the time, was not terminated for misconduct.  (Pls. Ex. L).[7]

It is undisputed that general downsizing "across the company" has occurred since EarthLink purchased OneComm.  (Sincavage Dep. at 125).  According to Gordon and Reumann, "[i]n 2011 and 2012, EarthLink terminated a total of 57 employees at the Burlington office, 39 of whom were over the age of 40."  (Pls. Ex. K).  EarthLink contends those employees were terminated for various unrelated reasons, "including position eliminations, attendance issues, and performance plan failures."  (Def. Resp. to Pls. SF at 32).  Furthermore, EarthLink asserts that many of the employees terminated during the time period in question held positions that were unrelated to plaintiffs, such as administrative and secretarial roles.  (*Id.*).

---

[6] EarthLink does not dispute that there was no specific policy in place preventing this practice.  However, the company does assert that by signing the orders, Reumann was participating in fraudulent sales practices and demonstrating poor leadership qualities. (Sen Decl. ¶ 31).

[7] EarthLink contends that while Sincavage's commissions were dependent upon the success of the teams she managed, the whistleblower complaint did not accuse her of fraudulent practices, there was no evidence she engaged in misconduct, and there was no evidence she condoned any misconduct.  (Def. Resp. to Pls. SF at 33).  It also appears that her position was eliminated in 2012, before she turned 40.  (Pls. Ex. K).

### B.      Procedural Background

On August 1, 2014, plaintiffs filed the complaint in this action in the Massachusetts

Superior Court, alleging age discrimination in violation of Mass. Gen. Laws ch. 151B, § 4.  The

complaint alleges claims based on disparate treatment and disparate impact as to each plaintiff.

On November 12, 2014, EarthLink removed the action to this court on the basis on diversity

jurisdiction.  EarthLink has moved for summary judgment and to strike certain affidavits

submitted by plaintiffs in support of their oppositions.

## II.   Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In making that determination, the court must view "the record in the light most favorable

to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d

20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the

adverse party must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted).  The

non-moving party may not simply "rest upon mere allegation or denials of his pleading," but

instead must "present affirmative evidence." *Id*. at 256-57.

### III.   Analysis

#### A.   Disputes Concerning the Evidence

As a preliminary matter, there are two disputes concerning the evidentiary record on summary judgment.  Generally speaking, other than affidavits, evidence must be admissible at trial in order to be considered on summary judgment.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990).  Plaintiffs have objected to the admissibility of various documents and statements related to EarthLink's investigation of their alleged misconduct.  EarthLink has moved to strike an affidavit submitted by a former OneComm employee who was terminated more than a year before the conduct here at issue (the Fabbricatore affidavit); an affidavit submitted by an individual that plaintiffs did not previously disclose as a witness (the MacNeil affidavit); and an affidavit submitted by plaintiffs' counsel (the McLucas affidavit).

##### 1.   Plaintiffs' Objections to the Admissibility of Evidence Concerning the Investigation

Plaintiffs contend that EarthLink is unable to "offer actual admissible evidence of any reason for [their] termination."  They contend that Candelaria was the human resources professional ultimately responsible for their terminations, and that there is no affidavit, deposition, or any other sworn statement from her in the record.  Therefore, plaintiffs contend, any evidence provided by EarthLink as reason for the terminations must be considered inadmissible hearsay.  While plaintiffs are not explicit about what evidence they are referring to, the record includes a summary of the interview with Gordon, an "Issue Summary" detailing the alleged reporting irregularities, an "Executive Summary" regarding the terminations, a timeline of events, and an investigation summary, each of which speak to the investigative process or the terminations.  (Sen Dep. Exs. 7-15).

The statements contained in the documents at issue are not hearsay, as they are not offered for their truth; they are offered to show that Sen and Candelaria believed that misconduct had occurred.  *See Morgan v. Massachusetts General Hosp.*, 901 F.2d 186, 190 (1st Cir. 1990) (determining that job counseling and committee reports were not admitted to "prov[e] the truth of their contents, but to prove what steps were taken to investigate the circumstances surrounding [an] assault").  In other words, it does not matter whether the company correctly concluded that plaintiffs had engaged in misconduct; what matters is that an investigation occurred, and as a result, that members of the committee *believed* that the plaintiffs had engaged in misconduct. *See Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc.*, 425 F.3d 67, 77 (1st Cir. 2005) (admitting out-of-court statements and reports because they were not offered to prove that an employee had engaged in misconduct, but rather to show that his superiors, based on their investigation, believed that he had); *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 346 (1st Cir. 1998) ("[A] customer complaint offered to show, for example, that a decisionmaker had notice of the complaint, rather than to prove the specific misconduct alleged in the complaint, is not barred by the hearsay rule").  The documents concerning the investigation are thus admissible, at a minimum, to the extent they are evidence of the knowledge and intent of the decision-makers leading up to the terminations.

Plaintiffs also contend that certain statements in the declarations of Koris and Sen should be disregarded as inadmissible.  The statement in Koris's declaration, which concerns the termination of a former employee for similar misconduct, is immaterial, as it does not speak to the results of the investigation or terminations of Gordon or Reumann.  Sen's statements concerning her experience in other terminations are likewise not relevant to the investigations and terminations here at issue.  Accordingly, neither statement will be considered.

2.      **EarthLink's Motion to Strike**

EarthLink has moved to strike the affidavits of Doug Fabbricatore, Jeannette MacNeil, and plaintiffs' counsel, Jeffrey McLucas.  Under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  The "requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise."  *Livick v. The Gillette Co.*, 524 F.3d 24, 28 (1st Cir. 2008) (internal quotation marks omitted).  "On a motion for summary judgment, the district court should disregard only those portions of an affidavit that are inadequate and consider the rest." *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 531 (5th Cir. 1992), *quoted in Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001).  In making this inquiry, "personal knowledge is the touchstone."  *Perez*, 247 F.3d at 315.

As to the Fabbricatore affidavit, EarthLink contends that the affidavit should be disregarded entirely, as Fabbricatore's employment with OneComm was terminated more than a year before Earthlink began the investigations at issue in this case.  Therefore, EarthLink contends, he has no personal knowledge of the investigation or events surrounding plaintiffs' terminations.

The Court will treat Fabbricatore as a fact witness, and allow his affidavit to stand, to the extent that he discusses factual matters (such as, for example, his description of the commissions process).  The affidavit establishes that Fabbricatore had experience with the commissions system at OneComm, as he was director of commissions.  However, the Court will strike his conclusory statements in paragraph 19, in which he states that "[t]here could be no reasonable, fair, objective, or good faith 'investigation' of anyone at OneCom relating to alleged or actual

11

commission issues as paid to sales personnel without involving the commission team as a

primary element of any such inquiry or investigation . . . ."  (Fabbricatore Aff. at ¶ 19).  He is not

an expert witness, and there is no reason to believe that he had any special expertise, experience,

or personal knowledge as to how to conduct sales audits, investigations in general, or the

investigation of plaintiffs in particular.

      As to the affidavit of MacNeil, the motion will be denied as moot, because the Court will

not rely on any of the disputed statements.  The affidavit appears to support plaintiffs' contention

that they did not, in fact, engage in any misconduct.  However, as discussed below, what matters

for present purposes is not whether they actually engaged in misconduct, but whether EarthLink

believed that they did and terminated them on that basis.

      Finally, the affidavit of McLucas, who is plaintiff's counsel, will be struck.  The affidavit

was submitted pursuant to Fed. R. Civ. P. 56(d).  Under that rule, "[i]f a nonmovant shows by

affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its

opposition [to a motion for summary judgment], the court may:  (1) defer considering the motion

or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any

other appropriate order."  Fed. R. Civ. P. 56(d).  The rule "protects a litigant who justifiably

needs additional time to respond in an effective manner to a summary judgment motion."

*Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc.*, 730 F.3d 23, 28 (1st Cir.

2013).  A Rule 56(d) affidavit must be "authoritative," "advanced in a timely manner," and it

must "explain why the party is unable currently to adduce the facts essential to opposing

summary judgment."  *In re PHC, Inc. Shareholder Litig.*, 762 F.3d 138, 143 (1st Cir. 2014)

(internal quotation marks omitted).  "If the reason the party cannot 'adduce the facts essential to

opposing summary judgment' is incomplete discovery, the party's explanation (i.e., the third

requirement) should:  (i) 'show good cause for the failure to have discovered the facts sooner';
(ii) 'set forth a plausible basis for believing that specific facts . . . probably exist'; and (iii)
'indicate how the emergent facts . . . will influence the outcome of the pending summary
judgment motion.'"  *Id.* (quoting *Resolution Trust Corp. v. North Bridge Assocs., Inc.*, 22 F.3d
1198, 1203 (1st Cir. 1994)).

The McLucas affidavit asserts that as a result of an earlier discovery dispute in which the
Court denied plaintiffs' motion to compel production of certain discovery, they lack "relevant,
discoverable and admissible evidence with which to . . . oppose the Defendant's Motion for
Summary Judgment."  (McLucas Aff. at ¶ 7).  However, an unfavorable discovery ruling does
not constitute "good cause" for the failure to have discovered evidence, and a Rule 56(d)
affidavit is not the appropriate vehicle for relitigating discovery disputes.  *See Davis v. Runnels*,
2013 WL 1983308, at *3 (E.D. Cal. May 13, 2013) (declining to revisit a motion to compel
through a Rule 56(d) request).  Accordingly, the McLucas affidavit will be struck.

## B.  <u>Disparate-Treatment Claims</u>

Massachusetts General Laws chapter 151B protects individuals between the ages of 40
and 65 from adverse employment decisions based on age.  *See* Mass. Gen. Laws ch. 151B, §
4(1B); *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 424 n.6 (2003).  Where a plaintiff alleges
disparate treatment based on a protected characteristic, Massachusetts courts follow the same
burden-shifting analytical framework that is applied in the federal Title VII context.  *Matthews v.
Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 127-28 (1997).  Under that framework, the
plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Id.* at 128
(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If that burden is met,
unlawful discrimination is presumed, and the burden shifts to the defendant "to articulate a

legitimate, nondiscriminatory reason for its [employment] decision and to 'produce credible evidence to show that the reason or reasons advanced were the real reasons.'" *Id.* (quoting *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 442 (1995)) (internal citations omitted). If the defendant meets that burden, "the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant's proffered reason for its employment decision was not the real reason, but is a pretext for discrimination." *Id.* (internal quotation marks omitted).

### 1.    *Prima Facie* **Case**

To establish a *prima facie* case of discrimination, "a plaintiff must provide 'evidence that: (1) he [or she] is a member of a class protected by G.L. c. 151B; he [or she] performed his [or her] job at an acceptable level; [and] he [or she] was terminated.'" *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016) (quoting *Blare*, 419 Mass. at 44) (alternations in original).[8]

---

[8] There is some inconsistency in the Massachusetts case law concerning the elements required to establish a *prima facie* case of discrimination. In *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34 (2005), the SJC explained that a plaintiff's *prima facie* burden generally consists of four elements: "that she is a member of a class protected by [Mass. Gen. Laws ch.] 151B; she performed her job at an acceptable level; she was terminated; and her employer sought to fill her position by hiring another individual with qualifications similar to hers." *Id.* at 41. The *Sullivan* court went on to explain that "[a]s generally formulated, the fourth element is nonsensical in a reduction in force case," *id.*; it then held that in a reduction-in-force case, a plaintiff "may satisfy the fourth element of her prima facie case by producing some evidence that her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination," *id.* at 45. In reformulating, rather than simply eliminating, the fourth element in reduction-in-force cases, the SJC noted that "it cannot be that every individual in the workforce who falls within some protected class (the overwhelming majority of employees) can establish a prima facie case of *discrimination* simply because she is laid off during a reduction in force." *Id.* at 41. However, more recently, in *Bulwer*, which was not a reduction-in-force case, the SJC laid out the *prima facie* case as consisting of only the first three elements. 473 Mass. at 681. The court in *Bulwer* quoted *Blare* for the relevant language. *Blare*, however, includes in its formulation of the *prima facie* case the fourth element that the "employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's." 419 Mass. at 441. *Bulwer* provides no explanation for the missing fourth element.

For present purposes, this Court will follow the three-pronged test laid out in *Bulwer*, which appears to be the current articulation of the *prima facie* test in Massachusetts. *See Massasoit Industrial Corp. v. Massachusetts Comm'n Against Discrimination*, 91 Mass. App. Ct. 208, 211 n.4 (2017) (noting that *Bulwer* "does not say that an employee in a discharge case must show that the position remained open or that the employer sought to fill the position with a person with similar qualifications" and applying three-pronged test). Furthermore, whether the fourth element is included here makes no difference, as the Court will assume for purposes of summary judgment that plaintiffs have satisfied their *prima facie* burdens.

The plaintiff's burden of establishing a *prima facie* case is "not intended to be onerous.  It is meant to be a 'small showing' that is 'easily made.'"  *Sullivan*, 444 Mass. at 45 (quoting *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003)) (internal citations omitted).

EarthLink contends that Gordon cannot show that his job performance was satisfactory. While there is evidence that Gordon spent little time in the office, and maintained outside businesses while simultaneously working at EarthLink, there is nothing in the record contradicting the evidence he was nevertheless able to perform his EarthLink duties at a satisfactory level, and that he received multiple sales achievement awards throughout his tenure with the company and its predecessors.  EarthLink also contends that Reumann is unable to show that his job performance was satisfactory.  It is clear, however, that Reumann was a leader of a sales team, who reported directly to a vice president of the Burlington office, and there is no evidence other than his termination to suggest any inability to sufficiently perform his duties.

The Court will accordingly assume for purposes of summary judgment that both plaintiffs have established a *prima facie* case of discrimination.

### 2.    Legitimate Non-Discriminatory Reason for Termination

Once a plaintiff has established a *prima facie* case, the burden of production shifts back to the defendant in order "to articulate a legitimate, nondiscriminatory basis for its adverse employment action."  *Torrech-Hernandez v. General Elec. Co.*, 519 F.3d 41, 48 (1st Cir. 2008) (internal quotation marks omitted).

EarthLink contends that both plaintiffs were terminated because they engaged in misconduct.  It is undisputed that Gordon maintained outside businesses while employed by EarthLink and re-routed his company phone number to a personal line.  It is likewise undisputed that EarthLink received a whistleblower complaint alleging that Gordon had submitted order

forms with irregularities in order to inflate his commissions.  As a result of that complaint, EarthLink initiated an investigation, during which Gordon told two members of the investigations committee that an alleged irregularity they perceived as capable of raising his commissions "could have been an oversight."  Furthermore, EarthLink contends that while there is no specific policy preventing a manager from signing one of his employee's orders, Reumann showed poor leadership skills by attesting to the accuracy of orders that appeared irregular without paying closer attention.

Those are unquestionably legitimate, nondiscriminatory reasons for termination.  *See Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990) (citing misconduct as a legitimate, nondiscriminatory reason for termination); *Soto-Feliciano v. Villa Cofresi Hotels, Inc.*, 779 F.3d 19, 24-25 (1st Cir. 2015).  Defendant has therefore met its burden at the second step.

### 3.    <u>Evidence of Pretext</u>

At the third step, the plaintiff must produce sufficient evidence that the defendant's stated reason for his or her termination was not true, but a pretext.  *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 398 (2016).

Massachusetts courts construe age-discrimination law the same as federal age-discrimination law in most respects, and "apply Federal case law construing the Federal antidiscrimination statutes in interpreting [Mass. Gen. Laws ch.] 151B."  *Sullivan*, 444 Mass. at 40 n.11 (quoting *Wheatley v. American Tel. & Tel. Co.*, 418 Mass. 394, 397, (1994)).  However, because Massachusetts is a "pretext-only" jurisdiction, "[t]o survive a motion for summary judgment, the plaintiff need only present evidence from which a reasonable jury could infer that 'the respondent's facially proper reasons given for its action against him were not the real reasons

for that action.'" *Bulwer*, 473 Mass. at 681-682 (quoting *Wheelock Coll. v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 139 (1976)).

Plaintiffs contend, among other things, that they were deceived regarding the reasons for their interviews; that the investigators did not understand the systems or the commissions process as a whole; that the investigation was neither reasonable nor objective; that the investigative reports contained fabricated information; and that EarthLink lost or intentionally destroyed documents concerning their terminations.[9]  However, where an employer's reason for termination is based on the results of an investigation into alleged misconduct, the inquiry is not whether the plaintiff's version of events is true, but whether the decision-maker reasonably believed that the plaintiff engaged in misconduct.  *See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico*, 404 F.3d 42, 45 (1st Cir. 2005).

It is undisputed that EarthLink received a whistleblower complaint specifically naming Gordon and Reumann, and, in response, assembled a multi-member investigatory team that conducted sales audits, technology audits, and multiple employee interviews before making any

---

[9] As to their spoliation argument, plaintiffs contend, among other things, that handwritten notes from the interviews, multiple interview summaries, and e-mail exchanges were "deleted, discarded, destroyed, or lost." However, "[b]efore an inference of spoliation may be drawn, its proponent must show at a bare minimum that the opposing party had notice of a potential claim and of the relevance to that claim of the destroyed evidence." *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012).  Furthermore, "[t]he party urging that spoliation has occurred must show that there is evidence that has been spoiled (i.e., destroyed or not preserved)." *Id.*  Here, the record evidence to which plaintiffs cite does not support a conclusion that most of the documents in contention ever existed in the first place, let alone that they were destroyed or discarded.  As to the handwritten notes, EarthLink concedes that such notes were taken during interviews, but contends all of that information contained in those notes was typed up and included in the summaries, which have been preserved.  Furthermore, plaintiffs have failed to establish that EarthLink had any obligation to preserve the notes.  They have not established that the notes were discarded or destroyed after EarthLink had notice of their claims. *See Gonzalez-Bermudez v. Abbott Laboratories PR Inc.*, 214 F.Supp.3d 130, 162 (D.P.R. 2016) (finding that an employer's duty to preserve e-mails did not arise until it received a letter from plaintiff's attorney warning of potential litigation for age discrimination).  Furthermore, to the extent that they rely on Mass. Gen. Laws ch. 149, § 52C to establish that EarthLink had a duty to maintain the notes, they have failed to establish that handwritten notes taken during an interview constitute a "personnel record" as defined by that statute.  *See* Mass. Gen. Laws ch. 149, § 52C.

terminations.[10]  It is also undisputed that in his interview with Sen and Candelaria, Gordon

admitted that one issue regarding the irregularities in his sales orders "could have been an

oversight."  Gordon Dep. at 244.  While Gordon subsequently—after his termination—changed

his position, his statement at the interview was certainly relevant to the state-of-mind of

EarthLink decision-makers at the time of his termination.  Furthermore, Gordon openly admitted

to maintaining outside businesses and re-routing his EarthLink telephone number to a private

line with IT's help.  Finally, while it was not against a specific company policy for Reumann to

sign orders on Gordon's behalf, it is undisputed that in doing so he knew that he was attesting to

their accuracy.

Plaintiffs have not demonstrated that, at the time of their terminations, the investigations

committee did not believe and rely on the results of its own investigation.  *See Bennett v. Saint-*

*Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007) (determining the key inquiry is what the

decisionmaker believed, and whether they acted on that belief in choosing to terminate an

employee).  Plaintiffs' dispute appears to focus primarily on the nature of the problem with the

sales-order paperwork and whether the investigation was conducted properly.  But even

assuming that the committee made mistakes in assessing the paperwork or did not fully

understand the systems in place at the time, that alone would not indicate that the reasons given

for the terminations were not the real reasons.  *See Kouvchinov v. Parametric Technology Corp*,

537 F.3d 62, 67 (1st Cir. 2008) (determining that in the pretext analysis, "it is not enough for a

plaintiff to show that the decisionmaker acted on an incorrect perception.  Instead, the plaintiff

must show that the decisionmaker did not believe in the accuracy of the reason given for the

---

[10] Plaintiffs did not answer EarthLink's statement of material facts in the standard paragraph-by-paragraph format.  Instead, they responded with their own, independent statement of material facts.  Therefore, any facts set out by EarthLink that plaintiffs did not directly respond to in their own statement will be treated as undisputed.

adverse employment action.") (internal citations omitted).

In other words, what matters is not whether the investigation was poorly done, unfair, or even whether plaintiffs in fact engaged in misconduct. *Cf. Joyal v. Hasbro*, 380 F.3d 14, 19 (1st Cir. 2004) (stating that it does not matter whether employer's decision was arbitrary or unwise). Rather, the crucial inquiry is whether EarthLink *believed* that plaintiffs engaged in misconduct and whether they terminated them based upon that belief. While plaintiffs question the competency with which the investigation was carried out, they point to no evidence suggesting that the investigations committee did not believe that they had engaged in misconduct.[11]

Pretext is also sometimes established by showing inconsistencies in the employer's stated legitimate reason for termination. *See Rhodes v. JPMorgan Chase & Co.*, 562 F. Supp. 2d 186, 193 (D. Mass. 2008). Plaintiffs contend that EarthLink provided Gordon with inconsistent justifications for his termination, first asserting that he was being terminated for moonlighting, and subsequently asserting he was terminated for reporting irregularities in his paperwork. However, informing an employee that he or she is being terminated for one infraction, without also explicitly listing a second infraction that was already discussed in-depth in the same meeting, is not an inconsistency that is sufficient to raise an inference of pretext. *Cf. Dominguez-Cruz v. Suttle Caribe, Inc*. 202 F.3d 424, 427 (1st Cir. 2000) (finding an inconsistency when "an employer ha[d], at different times, articulated to varied audiences

---

[11] A similar circumstance was before the Supreme Judicial Court in the *Sullivan* case. *See Sullivan*, 444 Mass. at 51-57. There, plaintiff was an in-house attorney whose manager selected her for layoff after comparing her performance evaluations, areas of expertise, and other characteristics to those of her co-workers. *Id.* at 51-52. There was no direct evidence of discriminatory animus on the part of the decision-maker. The primary reason for her layoff was her manager's negative impression of her abilities and complaints that he had received from her clients. *Id.* at 56-57. Plaintiff challenged the factual underpinning of that belief by arguing she was a competent attorney and that a negative impression of her was unwarranted. *Id.* Summary judgment for the employer was upheld, however, because plaintiff failed to come forward with evidence that her manager did not truly believe that she had mishandled her cases. *Id.*

different reasons for ending the plaintiff's employment).  *See also Ruiz v. Posadas de San Juan Assoc.*, 124 F.3d 243, 248 (1st Cir. 1997) (to refute the employer's legitimate, non-discriminatory reason, the plaintiff's "evidence must be of such strength and quality as to permit a reasonable finding that the . . . [termination] was obviously or manifestly unsupported.") (alteration in the original) (citations omitted).  Furthermore, whether the primary issue as to Gordon was moonlighting or irregular reporting is immaterial, as both constitute employee misconduct.

Plaintiffs also cite statistics concerning other terminations in the Burlington office to support their claim.  Statistical evidence of an employer's policies or practices may, under some circumstances, be probative in determining whether a general pattern of discrimination exists. *See McDonnell Douglas Corp.*, 411 U.S. at 805; *Sweeney v. Bd. of Trustees of Keene State Coll.*, 604 F.2d 106, 113 (1st Cir. 1979) (stating that statistics showing absence of women in "upper ranks" of institution were relevant to "add 'color'" to the decision-making process).  However, allegations of a discriminatory culture have less probative weight when, as here, the plaintiff is alleging disparate treatment.  *See Adamson v. Wyeth Pharmaceuticals*, 2005 WL 2323188, at *17 (D. Mass. Aug. 23, 2005); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993).  That is because "[i]n a disparate treatment case . . . the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why." *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 156 (1st Cir. 1990).  Evidence of an "atmosphere of discrimination" may be relevant to a disparate-treatment claim, but is not itself sufficient to establish such a claim.  *See Sweeney*, 604 F.2d at 113.

Plaintiffs also note that Sincavage was not investigated or terminated for misconduct, despite being mentioned in the whistleblower complaint, and they contend that that was because

she was under 40 at the time.  However, she was a vice-president of the company and, as a result, was more removed from the sales process than Reumann.  She did not, for example, directly sign or attest to the accuracy of any subordinate's paperwork.  EarthLink therefore had a legitimate reason for not terminating her as a result of the whistleblower complaint.

Finally, plaintiffs contend that EarthLink's decision not to "claw back" commission payments stemming from the allegedly improper sales orders casts doubt on the legitimacy of is proffered reason for their terminations.  However, an employer's decision not to take advantage of every avenue open to it to redress allegations of employee misconduct does not, in and of itself, suggest that it did not in fact believe the truth of the allegations.

In sum, plaintiffs have failed to show that EarthLink's stated reasons for their terminations was not the real reason.  Accordingly, defendant's motion for summary judgment will be granted as to the disparate-treatment claims.

### C.        Disparate-Impact Claims

Disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.15 (1977)).  *See also Sullivan*, 444 Mass. at 38 n.10.  Disparate-impact claims, unlike disparate-treatment claims, do not require a plaintiff to show proof of a discriminatory motive.  *Sullivan, 444 Mass.* at 38 n.10.  Nevertheless, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather, the employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'"  *Smith v. City of Jackson*, 544 U.S. 228, 241

21

(2005) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)) (emphasis in original).

To support their disparate-impact claim, plaintiffs contend that while EarthLink's Burlington office did not formally announce a reduction in force ("RIF"), the company nonetheless engaged in a RIF, during which it "forced out and fired under false pretenses high earning sales personnel such as the [plaintiffs]." (Gordon Opp. at 17; Reumann Opp. at 17). *See Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 281 (D. Conn. 2009) ("[T]he Plaintiff alleges that the Defendant's procedures in conducting the RIFs were nothing more than a cover for behind-the-scenes, intentional discrimination against its older employees. There is no allegation of a facially neutral practice or policy that fell more harshly on the protected group.").

Aside from generalized statements regarding company-wide downsizing, plaintiffs have not produced evidence to show that any RIF in fact occurred in the Burlington office or that their terminations were in fact a part of it. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 750 (9th Cir. 2003) ("To bring a disparate impact claim, [plaintiff] must show that he was subject to the particular employment practice with the alleged disparate impact. Because [plaintiff] was not formally or functionally subject to the RIF, his disparate impact claim cannot survive summary judgment."). While the record shows that several employees in the Burlington office were terminated because their positions were "eliminated," that is not the case for plaintiffs, who were both fired for misconduct. Furthermore, there is no evidence anywhere in the record of plaintiffs having been terminated due to downsizing or a RIF.

Accordingly, plaintiffs have failed to establish the existence of a facially neutral policy and that they were terminated as a result of that policy. Summary judgment will therefore be granted as to the disparate-impact claims.

**V.**   <u>**Conclusion**</u>

For the foregoing reasons, the motion to strike of defendant EarthLink, Inc. is

GRANTED in part and DENIED in part.  The motions of defendant EarthLink, Inc. for summary

judgment as to the claims of plaintiffs William Reumann and Douglas Gordon are GRANTED.

**So Ordered.**


　　　　　　　　　　　　　　　　　　　　　　　　<u>/s/ F. Dennis Saylor</u>
　　　　　　　　　　　　　　　　　　　　　　　　F. Dennis Saylor IV
Dated:  July 27, 2017　　　　　　　　　　　　United States District Judge